| | | |
|---|---|---|
| Estado Libre Asociado de Puerto Rico<br>TRIBUNAL DE APELACIONES<br>PANEL III | | |
| José M. Pérez López, Lorraine Alicea Torres y la Sociedad Legal de Gananciales compuesta por ambos<br><br>**Recurrente**<br><br>vs.<br><br>Consejo de Titulares del Condominio Costa Dorada II<br><br>**Recurrida** | TA2026RA00075 | *REVISIÓN ADMINISTRATIVA* procedente del Departamento de Asuntos del Consumidor<br><br>Querella Núm. C-ARE-2024-0006680<br><br>SOBRE: IMPUGNACIÓN DE ACUERDOS Y VOTOS TOMADOS EN ASAMBLEA ORDINARIA |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero.

**Hernández Sánchez, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 20 de marzo de 2026.

El 23 de febrero de 2026, el Sr. José M. Pérez López, la Sra. Lorraine Alicea Torres, y la Sociedad Legal de Gananciales compuesta por ambos (en conjunto, los recurrentes) comparecieron ante nos mediante un *Recurso de Revisión Judicial* y solicitaron la revocación de una *Resolución* que se emitió el 29 de diciembre de 2025 y se notificó el 31 de diciembre de 2025 por el Departamento de Asuntos de Consumidor (el DACo). Mediante el aludido dictamen, el DACo declaró No Ha Lugar la *Querella* que presentaron los recurrentes y, en consecuencia, se ordenó su cierre y archivo.

Por los fundamentos que expondremos a continuación **confirmamos** el dictamen recurrido.

I.

El 15 de noviembre de 2024, los recurrentes presentaron una *Querella* ante el DACo sobre impugnación de acuerdos y votos tomados en asamblea ordinaria contra el Consejo de Titulares del

Condominio Costa Dorada II (el Consejo o recurrido).[1] Alegaron que eran titulares del apartamento C-7 del Condominio Costa Dorada II, ubicado en Dorado, Puerto Rico, el cual fue sometido al régimen de propiedad horizontal mediante escritura matriz otorgada en el año 1990. Sostuvieron que, el 10 de febrero de 2024, se celebró una asamblea ordinaria del Consejo en la que se sometieron a votación tres (3) opciones de rediseño de la fachada del condominio y una propuesta para permitir a los titulares del primer piso remover las rejas de los balcones posteriores.

Manifestaron que, durante la asamblea, el Lcdo. Luis Cay expresó que dichas modificaciones requerían el voto afirmativo de dos terceras (2/3) partes de los titulares, basándose en los Arts. 39 y 52 de la Ley de Condominios de Puerto Rico, *infra.* Indicaron que ellos y otros titulares cuestionaron esa interpretación, señalando que el Art. 39(b)(5) de la referida ley establecía que, en los condominios creados previo a la vigencia de dicha ley, los cambios de fachada requerían la aprobación unánime del Consejo. Expresaron que, ante la controversia, se acordó que la Junta de Directores solicitaría una opinión legal independiente.

En cuanto a las votaciones celebradas, respecto a las opciones de diseño de fachada, indicaron que los titulares presentes votaron de la siguiente manera: la Opción #1 obtuvo 23 votos a favor y 6 en contra; la Opción #2 obtuvo 22 votos a favor; y la Opción #3 obtuvo 23 votos a favor. Expusieron que, por su parte, la propuesta para permitir la remoción de las rejas en los apartamentos del primer piso recibió 18 votos a favor y 5 en contra. De este modo, señalaron que ninguna de las propuestas alcanzó la unanimidad de los titulares.

Sostuvieron que, posteriormente, realizaron una consulta informal al DACO, donde se le informó que el requisito aplicable era

---

[1] *Véase,* Entrada Núm. 1 del apéndice del recurso, SUMAC TA.

la unanimidad. De igual forma, señalaron que el Lcdo. José E. De la Cruz Skerrett confirmó mediante consulta y opinión legal escrita que los cambios que alteraran la estética o diseño arquitectónico del condominio requerían aprobación unánime. No obstante, puntualizaron que, aunque la Junta de Directores comunicó dicha opinión meses después, no emitió una determinación final ni certificó si las propuestas sometidas a votación fueron aprobadas o rechazadas.

En vista de lo antes mencionado, argumentaron que las votaciones realizadas no cumplieron con el requisito de unanimidad exigido por la ley para cambios de fachada en condominios constituidos antes de su vigencia, y que la falta de una determinación oficial por parte de la Junta de Directores había generado incertidumbre entre los titulares respecto a los diseños permitidos y posibles remodelaciones. En consecuencia, solicitaron la intervención del DACO para que declarara nulos e ineficaces los acuerdos adoptados en la asamblea del 10 de febrero de 2024 relacionados con cambios arquitectónicos y de fachada, y ordenara a la Junta de Directores y al Consejo de Titulares cumplir estrictamente con los requisitos legales aplicables.

Así las cosas, el 2 de diciembre de 2024, el Consejo presentó una *Moción de Desestimación*.[2] Relató que, la querella impugnaba los acuerdos adoptados por el Consejo en la asamblea del 10 de febrero de 2024, particularmente los cambios propuestos a puertas, ventanas y rejas posteriores en los apartamentos del primer nivel. Señaló que, durante la asamblea surgieron dudas sobre si las alteraciones de fachada requerían el voto de dos terceras (2/3) partes de los titulares, conforme a los Arts. 39 y 52(c) de la Ley de Condominios de Puerto Rico, o unanimidad. Indicó que,

---

[2] *Véase*, Entrada Núm. 5 del apéndice del recurso, SUMAC TA.

posteriormente, el DACO y una opinión legal contratada por ellos coincidieron en que, por tratarse de un condominio previo a la ley vigente, los cambios de fachada requerían unanimidad.

Expresó que, aunque la Junta de Directores no había implementado un plan de acción al momento de radicarse la querella, el asunto sería reconsiderado en la asamblea anual programada para febrero de 2025, donde se evaluarían nuevamente los cambios conforme a la opinión legal emitida. Por ello, argumentó que no existía una controversia real y que el curso de acción adoptado por el Consejo atendería el reclamo planteado. En consecuencia, solicitó la desestimación de la querella por improcedente y académica, al no presentar un caso o controversia justiciable.

En respuesta, el 21 de diciembre de 2024, los recurrentes presentaron una *Moción en Oposición de Moción de Desestimación y Solicitud de Resolución Sumaria.*[3] Argumentaron que la solicitud de desestimación carecía de fundamento, ya que la querella sí exponía alegaciones suficientes para justificar el remedio solicitado. Señalaron que el Consejo basó su planteamiento en la alegación de que se convocaría una asamblea en febrero de 2025 para votar nuevamente sobre los cambios de fachada, pretendiendo que esa futura votación volviese académica la controversia actual. Sin embargo, expusieron que la querella se centraba en la validez de los votos tomados en la asamblea del 10 de febrero de 2024, los cuales, a su juicio, eran nulos, y que la Junta de Directores se había negado a reconocer su invalidez, insistiendo incluso en su moción que las propuestas fueron aprobadas.

Argumentaron que existía una controversia viva que le correspondía resolver al DACo, pues una votación futura no alteraba

---

[3] *Véase*, Entrada Núm. 7 del apéndice del recurso, SUMAC TA.

la validez de los votos impugnados. Insistieron que aun si se celebraba una nueva votación, su resultado era incierto y no podía servir de base para declarar académica la controversia actual. Además, sostuvieron que aceptar ese argumento permitiría que la Junta de Directores convirtiera el asunto en recurrente al someter repetidamente propuestas similares sin atender la legalidad de los votos previos.

Por otro lado, añadieron que miembros de la comunidad, incluso de la Junta de Directores, habían realizado cambios de ventanas que afectaban la fachada, lo que evidenciaba la necesidad de intervención del foro administrativo para garantizar el cumplimiento de la ley. Así pues, nuevamente solicitaron que se declararan nulos los votos adoptados por no cumplir con el requisito de unanimidad del Consejo.

El 17 de enero de 2025, el Consejo presentó una *Réplica a Oposición a Moción de Desestimación* en la cual, en síntesis, reiteró que el acuerdo aprobado el 10 de febrero de 2024 no se pondría en vigor y se sustituiría por lo que se determinara el Consejo en la asamblea que se celebraría el 23 de febrero de 2025.[4] A tales efectos, insistieron que dejó existir una controversia que motivara la radicación de la querella y, en consecuencia, se debía desestimar.

Por su parte, el 18 de febrero de 2025, los recurrentes presentaron una *Breve Dúplica a Moción en Réplica a Oposición a Moción de Desestimación.*[5] Expresaron que, aunque la opinión legal del Lcdo. José E. De la Cruz concluyó que los votos sobre los cambios de fachada adoptados en la Asamblea Ordinaria del año 2024 eran nulos, la Junta de Directores tenía el deber ministerial de comunicar y certificar formalmente al Consejo la validez o nulidad de dichas resoluciones, lo cual no había ocurrido. Expusieron que,

---

[4] *Véase*, Entrada Núm. 8 del apéndice del recurso, SUMAC TA.
[5] *Véase*, Entrada Núm. 9 del apéndice del recurso, SUMAC TA.

a pesar de que el secretario de la Junta y recurrente en el presente caso, el Sr. José Pérez López, agotó gestiones internas para que se cumpliera con esa responsabilidad, la Junta de Directores se limitó a circular la opinión legal sin emitir una determinación clara, lo que motivó la presentación de la querella ante el DACo.

Además, puntualizaron que la Junta de Directores pretendía subsanar la situación mediante una nueva asamblea, pero la convocatoria para febrero de 2025 revelaba un cambio preocupante: se buscaba someter a aprobación *ex post facto* modificaciones de fachada ya realizadas en violación de la Ley de Condominios de Puerto Rico, la escritura matriz y el reglamento del condominio. Así pues, cuestionaron la legalidad de dicha propuesta, especialmente ante la posibilidad de que se intentara aprobar por mayoría simple cambios que requerían unanimidad.

En virtud de lo antes expresado, reiteraron que la Junta de Directores había evadido su deber de aclarar la nulidad de los votos del año 2024, había manejado el proceso de manera irregular y pretendía validar retroactivamente cambios ilegales. Insistieron que, aunque la Junta de Directores afirmó que los acuerdos no se implementarían, los titulares requerían una determinación final y vinculante. Por ello, solicitaron que se declarara No Ha Lugar la moción de desestimación, que se declararan nulos los acuerdos sobre cambios de fachada adoptados el 10 de febrero de 2024 por falta de unanimidad, y que se ordenara el cumplimiento estricto de los requisitos legales aplicables.

Posteriormente, el 25 de marzo de 2025, los recurrentes presentaron una *Primera Querella Enmendada.*[6] Expusieron que, hasta la fecha, la Junta de Directores no había emitido una determinación clara ni una certificación oficial sobre si las acciones

---

[6] *Véase,* Anejo intitulado "O" de la Entrada Núm. 11 del apéndice del recurso, SUMAC TA.

tomadas en la Asamblea Ordinaria del año 2024 fueron aprobadas con el número de votos requerido por ley. Relataron que el Sr. José M. Pérez López, en su función de Secretario de la Junta de Directores, hasta el 23 de febrero de 2025, insistió reiteradamente en que la Junta de Directores tenía el deber de notificarle al Consejo que los cambios de fachada aprobados eran inválidos y de orientarle sobre los diseños permitidos para que los titulares pudiesen realizar remodelaciones conforme a la normativa vigente.

Indicaron que, tras radicarse la querella, el Consejo solicitó su desestimación alegando que no existía controversia justiciable, ya que los asuntos serían sometidos nuevamente a votación en la asamblea ordinaria del año 2025. Expresaron que, posteriormente, se convocó dicha asamblea, en cuya agenda se incluyeron tres (3) propuestas de cambios de fachada y, a diferencia de la asamblea anterior, se propuso aprobar *ex post facto* las modificaciones ya realizadas en algunos apartamentos en aparente violación a la ley y a los documentos rectores del condominio. Indicaron que, según el acta circulada, las votaciones fueron tratadas como unánimes luego de descartarse las oposiciones presentadas, incluyendo las de ellos.

Ante ello, sostuvieron que el proceso utilizado fue improcedente, pues el Consejo determinó por mayoría que las oposiciones eran caprichosas y luego declaró aprobadas las propuestas por unanimidad. Señalaron que las medidas incluyeron autorizar nuevos diseños de ventanas, permitir la remoción de rejas en balcones del primer piso y validar retroactivamente cambios ya realizados. Argumentaron que estas decisiones violaban el requisito de uniformidad exigido para cambios de fachada.

En vista de lo anterior, invocaron el Art. 39(b)(5) de la Ley de Condominios de Puerto Rico, que exige unanimidad para cambios de fachada en condominios establecidos previo a la ley; el Art. 3(o) del mismo estatuto, que define la fachada como el conjunto estético

exterior del edificio; el Art. 15 de la Escritura Matriz, que prohíbe cambios arquitectónicos sin autorización previa y exige uniformidad; y el Art. 53 de la ley, que impone a la Junta de Directores el deber de velar por el cumplimiento de las normas y la adecuada administración del condominio. También señalaron que los cambios propuestos no fueron evaluados ni aprobados por la Junta de Directores conforme exige la Escritura Matriz, y que el Secretario no participó en reuniones donde se discutieran dichas propuestas.

Por último, concluyeron que las determinaciones del Consejo para alterar la fachada requerían el consentimiento unánime de todos los titulares y que los votos no alcanzaron ese requisito. Además, impugnaron la aprobación de cambios no uniformes y la validación retroactiva de modificaciones realizadas sin autorización. Por ello, solicitaron que se declararan nulos los acuerdos adoptados en las asambleas de 2024 y 2025, que se reconociera la legitimidad de las oposiciones presentadas, que se ordenara revertir las alteraciones no autorizadas y que se instruyera a la Junta y al Consejo a cumplir estrictamente con la ley, la Escritura Matriz y el reglamento del condominio.

Así las cosas, el 8 de abril de 2025, el Consejo presentó una *Oposición a Enmienda; Moción Reiterando Desestimación.*[7] En síntesis, argumentó que no procedía la enmienda de la querella, ya que la causa original se había extinguido y concluido. Particularmente, expuso que la querella se había tornado académica, pues la controversia planteada fue atendida y resuelta en la Asamblea de Titulares celebrada el 23 de febrero de 2025. Indicó que, en esa reunión se votaron nuevamente las propuestas de cambios de fachada, puertas, ventanas y barandas, cumpliendo

---

[7] *Véase*, Entrada Núm. 12 del apéndice del recurso, SUMAC TA.

con los requisitos de unanimidad de la Ley de Condominios, eliminando oposiciones consideradas caprichosas y notificando adecuadamente a los titulares ausentes, quienes no presentaron objeción dentro del plazo. Por todo lo anterior, solicitó que la querella enmendada fuese desestimada de plano.

El 23 de agosto de 2025, los recurrentes presentaron una *Moción en Oposición a Moción de Oposición a Enmienda a Querella; Moción Reiterando Desestimación.*[8] Posteriormente, el 29 de agosto de 2025, el Consejo presentó su *Réplica a Moción de la Parte Querellante de 23 de agosto de 2025* [...].[9] En ambos escritos, las partes reiteraron los argumentos previamente esbozados en sus comparecencias anteriores. Además, el 11 de septiembre de 2025, los recurrentes presentaron una *Breve Moción de Dúplica.*[10]

Sometido el asunto ante la consideración del DACo, se celebró vista administrativa el 13 de agosto de 2025. Posteriormente, el DACo emitió *Resolución* el 29 de diciembre de 2025, la cual fue notificada el 31 de diciembre de 2025.[11] En primer lugar, formuló las siguientes determinaciones de hechos:

1. Los esposos querellantes José Pérez y Lorraine Alicea son titulares del apartamento residencial C-7 del Condominio Costa Dorada II.

2. El Condominio Costa Dorada II está localizado en Dorado, Puerto Rico. El mismo está compuesto de cuatro edificios que comprenden 54 apartamentos.

3. El Condominio Costa Dorada II se encuentra sometido al Régimen de Propiedad Horizontal, conforme a la escritura numero 7 titulada *Deed of Constitution of Horizontal Property Villas de Costa Dorada II* (en adelante la Escritura Matriz), otorgada el 16 de enero de 1990 ante la notaria Carmen P. Cruz Rosario

4. La Escritura Matriz considera las ventanas y puertas como parte de la fachada y prohíbe los cambios a ese

---

[8] *Véase,* Entrada Núm. 14 del apéndice del recurso, SUMAC TA.
[9] *Véase,* Entrada Núm. 15 del apéndice del recurso, SUMAC TA.
[10] *Véase,* Entrada Núm. 16 del apéndice del recurso, SUMAC TA.
[11] *Véase,* Entrada Núm. 17 del apéndice del recurso, SUMAC TA.

elemento, a menos que se trate de alguno que sea uniforme a través del régimen. Al respecto, dispone en su expositivo decimoquinto (FIFTEENTH) lo siguiente:

---FIFTEENTH: A unit shall not make structural modifications to its Unit or installations located therein without previously obtaining the written approval of the Council of Owners. Nonstructural interiors modifications may be made as provided for in the By-Laws with the prior written consent of the Board of Directors. No changes shall ever be made to the facades of the Regime unless they shall be uniformed throughout the Regime in no screened enclosures of outside balconies, loggias, terraces, halls or corridors shall be permitted. Exterior windows, doors, and exterior walls within otherwise private terraces, courts, balconies, and like structures shall be considered part of the façade of the Regime, and as such no alterations shall be allowed unless uniformly made throughout the Regime and with the prior written consent of TORREL, or the Board of Directors after examining the related plans and drawings.

5. A la Escritura Matriz se unió el Reglamento del Condominio, identificado como *Villas de Costa Dorada II By-Laws*. Como parte de las reglas que gobiernan el uso de los apartamentos y uso de los elementos comunes, este Reglamento establece en su Article V, Section Two (2) (K) y (N), lo siguiente, en particular:

   **---Section Two (2): Rules governing use of Apartments and use of elements held in common.**

   …

   -----(K): No owner or resident shall do anything to affect or alter the façade of the building, shall not paint or decorate the exterior walls doors or windows, in colors or hues different to the colors or hues in which it is originally painted. Installment of individual wall air conditioning units shall only be permitted in designated areas, as provided by the plans of the Regime.

   …

   ---(N): Each owner shall carry out at his sole expense the works modification, repair, cleaning safety and improvement of his apartment, without disturbing the lawful use, possession and enjoyment of the other co-owners and without changing the form and facade of the buildings of the Regime.

6. Mediante convocatoria con fecha del 24 de enero de 2024 la Junta de Directores del Condominio Dorada II convocó al Consejo de Titulares a la Asamblea Anual Ordinaria, a celebrarse el 10 de febrero de 2024. La Agenda que se incluyó con la Convocatoria dispone, entre otros, un inciso 7 que expresa así:

7. Otros asuntos

...

b. Aprobaciones arquitectónicas

(1) Presentación y aprobación de opción I de cambia de puertas y/o ventanas.

(2) Presentación y aprobación de opción 2 de cambio de puertas y/o ventanas

(3) Presentación y aprobación de opción 3 de cambio de puertas y/a ventanas ubicados en los primeros niveles.

(4) Propuesta y aprobación de remoción de rejas posteriores en los apartamentos ubicados en los primeros niveles.

7. El 10 de febrero de 2024 se celebró la asamblea ordinaria del Consejo de Titulares del Condominio Costa Dorada II.

8. El Acta de la Asamblea Ordinaria fue suscrita el 16 de febrero de 2024 conforme la misma, asistieron a dicha asamblea un total de 28 titulares, de los cuales 18 estuvieron presentes y 10 representados bajo proxy.

9. Los querellantes José Pérez y Loraine Alicea asistieron a la Asamblea Ordinaria del 10 de febrero de 2024.

10. Con relación al tema sobre los cambios arquitectónicas, el asesor legal llevado a la asamblea por la Junta de Directores argumentó que la aprobación de esos cambios estaba sujeto al voto afirmativo de dos terceras (2/3) partes de los titulares. El querellante José Pérez y otro de los titulares expresaron sus dudas en cuanto al voto requerido para aprobación de cambios de fachada alegando que la Ley de Condominios de Puerto Rico (Ley Núm. 129 del 2020) dispone que los condominios creados previo a su aprobación requerían unanimidad.

Se acordó en la asamblea proceder con la votación pero que se procuraría una opinión, legal independiente para asegurar que el voto cumpliera con los requisitos legales.

11. Con relación al tema sobre las aprobaciones arquitectónicas de cambio de puertas y ventanas, se llevaron a votación las 3 opciones y fueron aprobadas por la mayoría.

La Opción 1 fue aprobada por 23 votos y tuvo 5 votos en contra.

La Opción 2 fue aprobada por 22 votos ý tuvo 6 votos en contra.

La Opción 3 fue aprobada por 23 votos y tuvo 5 votos en contra.

Con relación al tema sobre la remoción de rejas en la parte posterior de los apartamentos en los primeros niveles, se permitió a aquel que desee remover cubriendo los gastos de remoción de rejas y muros. Se llevó a votación y fue aprobado por la mayoría, con 18 votos a favor y 5 en contra.

12. La querellante Lorraine Alicea le envió a la Junta de Directores una carta con fecha del 4 de marzo de 2024, reafirmando su inconformidad con la interpretación que se indicó en la asamblea sobre el voto requerido para aprobar alteraciones a la fachada. Ésta expresó los asesoramientos que había conseguido al respecto y solicitó que se le informara al Consejo de Titulares que la Ley Núm. 129 del 16 de agosto de 2020 indica que se requiere de voto unánime para aprobar cambios arquitectónicos o de fachada.

13. El 22 de marzo de 2024 la Junta de Directores llevó a cabo una consulta con otro asesor legal, mediante la cual se les señaló que el proceso llevado a cabo con respecto a los cambios de fachada y sometidos a votación en la asamblea celebrada el 10 de febrero de 2024 no fue realizado correctamente.

14. El 19 de abril de 2024 la Junta de Directores le envió al Consejo de Titulares una comunicación mediante la cual explicó que como resultado de la consulta legal la votación sobre cambios de fachada llevada a cabo en la asamblea no procedía. A su vez, detalló las aclaraciones obtenidas en cuanto al requisito de unanimidad para cambios de fachada en todo condominio sometido al régimen de propiedad horizontal previo a la aprobación de la Ley Núm. 129 de 2020, el requisito de un arquitecto (perito) que realice una evaluación y diseño apropiado de la fachada para cambios que envuelvan un nuevo

diseño de puertas y ventanas, y otros requisitos que añade la Ley 129 al proceso de votación para cambios de fachada. También expresó que se podrá someter nuevamente a votación aquellos cambios de fachada que cumplan con los requisitos y debido proceso de la Ley 129, pero mientras tanto no se podrían realizar remodelaciones qué afecten la fachada del condominio.

15. El 18 de julio de 2024 la Junta de Directores recibió la opinión legal escrita del asesor consultado, mediante la cual se detallan unos señalamientos de omisiones en el proceso de presentación y votación relacionados a los cambios de fachada aprobados, con las recomendaciones a seguir.

16. El 18 de septiembre de 2024 la Junta de Directores le comunicó al Consejo de Titulares, la opinión legal escrita que recibió, y que se encontraba evaluando las recomendaciones, presentadas en la misma.

17. El 18 de noviembre de 2024 el querellante José Pérez radicó en el DACO la querella de epígrafe, alegando falta de una determinación clara y final por parte de la Junta de Directores sobre si las acciones tomadas en la asamblea fueron aprobadas o no por el mínimo de votos requeridos. Éste solicitó como remedios que se declaren nulos e ineficaz los acuerdos tomados durante la asamblea celebrada el 10 de febrero de 2024 relacionados a cambios arquitectónicos y a la fachada del condominio por incumplimiento con el requisito de unanimidad, y que se ordene a la Junta de Directores al Consejo de Titulares a asegurar que los cambios de fachada o elementos arquitectónicos del condominio cumplan con los requisitos de ley.

18. El 2 de diciembre de 2024 la parte querellada, mediante su representante legal, radicó una Moción de Desestimación. Alegó, en síntesis, haberse atendido el requerimiento de la parte querellante toda vez que la Junta de Directores tenía programada la celebración de la Asamblea Ordinaria para el mes de febrero de 2025 y como parte de la agenda estaría incluida la aprobación de los cambios de ventanas, puertas y rejas objeto de la controversia, tomando en cuenta la opinión legal que recibieron en julio de 2024. Expresó no haber controversia alguna de que las decisiones del Consejo de Titulares iban encaminadas a ser debatidas para que se adopte una nueva decisión de forma unánime, sujeta a las disposiciones del Artículo 52 de la Ley 129-2020, pudiéndose

descartar las votaciones de oposición sin fundamentos y/o caprichosas. Por lo cual, argumentó que la reclamación de la querella se habría tornado académica ya que se estaría sometiendo el asunto nuevamente ante la consideración del Consejo de Titulares, y por ello solicitó la desestimación de la querella.

19. El 16 de diciembre de 2024 la querella fue enmendada para incluir como parte querellante a la señora Lorraine Alicea.

20. El 7 de febrero de 2025 la Junta de Directores del Condominio Costa Dorada II convocó a la Asamblea Anual a celebrarse el 23 de febrero de 2025. La Agenda que se incluyó con la Convocatoria dispone, entre otros, un inciso 7 que expresa así:

7. Otros Asuntos

a. Aprobaciones Arquitectónicas

(1) Presentación y aprobación de opción de cambio de puertas y/o ventanas (slidding y guillotinas)

(2) Presentación y aprobación de opción 2 de cambio de puertas y/o ventanas (slidding y proyected)

(3) Presentación y aprobación de opción 3 de cambio de puertas y/o ventanas (slidding doors de 4 hojas parte posterior)

(4) Propuesta y aprobación de remoción de rejas posteriores en los apartamentos ubicados en los primeros nieveles.

(5) Aprobación de Puertas y ventanas ya instaladas (balcón y terraza) en las villas.

21. Los querellantes José Pérez y Loraine Alicea asistieron a la Asamblea Anual de 23 de febrero de 2025.

22. El Acta de la Asamblea Anual del 2025 fue suscrita el 2 de marzo de 2025. Conforme la misma, asistieron a dicha asamblea un total de 35 titulares, de los cuales 20 estuvieron presentes y 15 representados por proxy.

23. Durante la Asamblea Anual 2025, con relación al tema sobre las tres alternativas u opciones

arquitectónicas de cambio de puertas y ventanas; se sometió a la consideración y debate del Consejo de Titulares las tres opciones y se trató la aprobación de las alternativas como si requiriesen el voto unánime de los titulares. Ello ya que se expuso que no estaba compareciendo un arquitecto que opinara si dichas opciones cambiaban la forma externa de la fachada ni tampoco un perito que expresara que las ventanas y puertas existentes y a ser reemplazadas no podían ser reparadas o sustituidas por las del diseño original del edificio.

Cada una de las opciones fue discutida extensamente.

La Opción 1 tuvo oposición de 4 titulares, incluyendo la querellante Lorraine Alicea, Al concluir la discusión de dicha opción, se pidió a los (titulares que se opusieron que fundamentaran expresamente su oposición, lo que cada uno individualmente hizo. Luego se pasó al juicio del Consejo de Titulares los fundamentos de las oposiciones para que determinara si cada una de las oposiciones escuchadas configuraban o no un voto caprichoso. El Consejo declaró, por voto mayoritario, cada una de las cuatro oposiciones caprichosa. Por lo que la Opción I se dio por aprobada, unánimemente en la asamblea, al descartarse las cuatro oposiciones por el Consejo de Titulares al determinar, por voto mayoritario, que eran caprichosas.

La Opción 2 tuvo oposición de 2 titulares, incluyendo el querellante José Pérez. Al concluir la discusión de dicha opción, se pidió a los titulares que se opusieron que fundamentaran expresamente su oposición, lo que cada uno individualmente hizo. Luego se pasó al juicio del Consejo de Titulares los fundamentos de las oposiciones para que determinara si cada una de las oposiciones escuchadas configuraban o no un voto caprichoso. El Consejo declaró, por voto mayoritario, cada una de las dos oposiciones caprichosa. Por lo que la Opción 2 se dio por aprobada, unánimemente en la asamblea, al descartarse, las dos oposiciones por el Consejo de Titulares al determinar, por voto mayoritario, que eran caprichosas.

24. Durante la Asamblea 2025, con relación al tema sobre la remoción de barandas, voluntad del titular, en balcones posteriores de apartamentos en el primer piso, se discutieron las razones que favorecían la permanencia de las barandas o permitir su eliminación. Dicha medida para permitir

la remoción de las barandas a los titulares que así lo desearan tuvo oposición de 2 titulares, incluyendo la querellante Lorraine Alicea. Al concluir la discusión de dicha medida, y ante la posibilidad de que tal cambio pudiera afectar la fachada y requiriese el voto unánime de los titulares, se permitió a los titulares que se opusieron a que expresaran los fundamentos de su-oposición. Luego se pasó el asunto nuevamente al Consejo de Titulares para que determinara si los fundamentos expresados por los titulares opuestos al cambio eran o no caprichosos. El Consejo declaró, por voto mayoritario, cada una de las dos oposiciones caprichosa. Por lo que dicha medida se dio por aprobada, unánimemente en la asamblea, al descartarse las dos oposiciones por el Consejo de Titulares al determinar, por voto mayoritario, que eran caprichosas.

25. Durante la Asamblea 2025 también se sometió a la consideración del Consejo que se permitiera y tolerase las puertas y ventanas que estuvieran instaladas en balcones y terrazas en 11 apartamentos, pero obligándolos a adoptar los modelos de puertas y ventanas aprobados por el Consejo de Titulares una vez fueran a reemplazar las que estaban instaladas. Ante la posibilidad de que dicha aprobación pudiera requerir del voto unánime de los titulares, se requirió que cualquier titular opuesto fundamentara su oposición. La única oposición a ello fue la de la querellante Lorraine Alicea. Luego se pasó el asunto al Consejo de Titulares para que determinara si el fundamento de la oposición era o no caprichoso. El Consejo de Titulares determinó, por voto mayoritario, que esa oposición era caprichosa. Por lo que dicho asunto se dio por aprobado unánimemente en la asamblea, al descartarse la única oposición por el Consejo de Titulares allí determinar, por voto mayoritario, que era caprichosa.

26. Los titulares que estuvieron ausentes de la asamblea celebrada el 23 de febrero de 2025 fueron notificados, mediante comunicación escrita del 2 de marzo de 2025, de las decisiones tomadas por el Consejo de Titulares durante la asamblea. Se les informó sobre su derecho a discrepar de los acuerdos adoptados toda vez que dichas decisiones pueden requerir unanimidad. Se les notificó que tenían un término de 30 días para manifestar su conformidad o discrepancia con las decisiones tomadas en la asamblea que pudieran requerir el consenso unánime de los titulares.

27. El 25 de marzo de 2025 la parte querellante radicó una querella enmendada para incluir las siguientes alegaciones relacionadas a la Asamblea 2025: (i) incumplimiento con los requisitos procesales requeridos por la Escritura Matriz y el Reglamento del Condominio relacionados a la aprobación de cambios arquitectónicos y de fachada (unanimidad y uniformidad); (ii) la impugnación de determinaciones del Consejo durante la Asamblea 2025 a los efectos de que sus votos fueron caprichosos; y (iii) la nulidad de las acciones tomadas en la Asamblea 2025 sobre cambios de fachada y arquitectónicos. La parte querellante solicitó como remedios adicionales que se determinara que sus votos en la asamblea 2025 no fueron caprichosos, que se declaren nulos e ineficaz los acuerdos tomados durante la asamblea celebrada el 23 de febrero de 2025 relacionados a cambios de ventanas y de autorización de remoción de rejas posteriores del primer piso por incumplimiento con el requisito de unanimidad y por ser contrario al requisito de uniformidad, que se declare nulo e ineficaz el voto tomado en la asamblea 2025 para aprobar ex post facto los cambios de ventanas realizados, que los apartamentos que han realizado cambios de ventanas no aprobados reviertan a los diseños aprobados conforme a los requisitos aplicables.

28. El 8 de abril de 2025 la Administración del Condominio certificó que no se recibió objeción alguna de los ausentes a la asamblea celebrada el 23 de febrero de 2025.

29. El 8 de abril de 2025 la parte querellada radicó una "Oposición a Enmienda a Querella". Reiteró, entre otros, su alegación de que la reclamación estaba extinta y se había tornado académica toda vez que los acuerdos alcanzados en la asamblea del 2024 no se implementaron y quedaron aprobados en la asamblea del 2025.

30. El 6 de junio de 2025 el presidente de la Junta de Directores emitió una certificación en cuanto a que los acuerdos en la asamblea anual de 23 de febrero de 2025 sobre la aprobación de las tres opciones de puertas y ventanas, la remoción de barandas en balcones posteriores y la permisibilidad a puertas y ventanas ya instaladas habían quedado aprobados por la unanimidad de los titulares.

Luego, a la luz de las determinaciones de hechos previamente expuestas, del derecho aplicable y tras evaluar la prueba testifical y

documental, declaró No Ha Lugar la querella presentada y ordenó su cierre y archivo. Particularmente, resolvió lo siguiente:

[…]

Nos corresponde resolver las siguientes reclamaciones presentadas por la parte querellante sobre: 1) invalidez de los acuerdos de la asamblea del 2024, 2) la determinación de que sus votos en oposición en la asamblea del 2025 fueron caprichosos, y 3) la aprobación de cambios que no son uniformes cuando la escritura matriz y el reglamento del Condominio lo prohíbe. Veamos.

[…]

En el presente caso, no existe controversia en cuanto a que las propuestas presentadas en la asamblea constituyen un cambio de fachada y el Condominio Villas de Costa Dorada II fue sometido al régimen de propiedad horizontal previo a la aprobación de la vigente Ley de-Condominios. Por tanto, los cambios propuestos requerían la aprobación unánime de los titulares. Posterior a la celebración de la asamblea del 2024 el querellado aceptó la aplicabilidad del requisito. de unanimidad. Por lo que fundamenta la parte querellada que la alegación y/o reclamo sobre la invalidez de la aprobación de las propuestas de la asamblea del 2024 se convirtió en un asunto académico. Sin necesidad de realizar un análisis exhaustivo, determinamos que tiene razón el querellado.

No solo al contestar la querella el querellado confirmo la interpretación de que se requiere la aprobación unánime para alterar la estética o diseño arquitectónico del Condominio, sino que previo a la radicación de la querella ya había aceptado tal requisito y se le notificó a los titulares al respecto. Mediante el comunicado de abril de 2024, la Junta de Directores le notificó al Consejo de Titulares que la votación sobre cambios de fachada llevada a cabo en la asamblea no procedía, que se podrá someter nuevamente a votación aquellos cambios de fachada que cumplan con los requisitos de ley y que mientras tanto no se podrían realizar remodelaciones que afecten la fachada del condominio. (Véase determinación de hechos 14). Posteriormente, y previo a la radicación de la querella, la Junta de Directores también le notificó al Consejo de Titulares la opinión legal escrita que recibió, mediante la cual se le detallaron unos señalamientos de omisiones en el proceso de presentación y votación relacionados a los cambios de fachada aprobados (Véanse determinación de hechos 15 y 16). Por tanto, la Junta de Directores sí había atendido ya el, requerimiento de la parte querellante, no solo tomó una determinación sino que notificó la misma a los titulares. Precisamente por ello se estaría sometiendo el asunto nuevamente en la asamblea ordinaria del 2025, consciente de que la

decisión que se adoptara debía ser de forma unánime: En consecuencia, ya no existía controversia sobre dicho asunto. El mismo se había tornado académico.

[...]

Procedemos a resolver la impugnación presentada (por la parte querellante sobre las› determinaciones del Consejo durante la asamblea del 2025 a los efectos de que sus votos en posición fueron caprichosos.
[...]

Durante la asamblea del 2025, se trató la aprobación de los temas relevantes a la querella como si requiriesen el voto unánime de los titulares: Las propuestas fueron discutidas y se brindó la oportunidad a los titulares que se opusieron a que fundamentaran expresamente su oposición, lo que cada uno individualmente hizo. Luego se pasó al juicio del Consejo de Titulares los fundamentos de las oposiciones y el Consejo determinó por voto mayoritario cada una de las oposiciones como caprichosa. Por lo que quedaron descartadas las oposiciones, logrando la aprobación de las propuestas unánimemente en la asamblea. A su vez, se notificó a los ausentes a la asamblea de las decisiones tomadas y de las instrucciones sobre cómo emitir su voto a favor o en contra de las propuestas, y no se recibió oposición alguna de los ausentes a la asamblea.

La parte querellante cuestiona la determinación de que sus votos de oposición fueron caprichosos, y alega que dicho proceso de descartar sus votos no es válido. La declaración de que el voto de los querellantes fue uno caprichoso fue tomada por el Consejo de Titulares en 1a asamblea, según dispone y permite la Ley de Condominios, supra. No existe evidencia ni la parte querellante demostró que el proceso no se llevó a cabo correctamente. Al contrario, conforme la prueba que obra ante nuestra consideración, el proceso seguido por el Consejo de Titulares durante la asamblea del 2025 dio cumplimiento estricto a las disposiciones de la Ley de Condominios, supra, relacionadas a los votos de oposición en una asamblea. Determinamos que el proceso realizado durante la asamblea del 2025 fue uno válido. Por lo que tiene razón la parte querellada. El reclamo de los querellantes no justifica la concesión de un remedio.

[...]

Resta por resolver la acción de nulidad de las aprobaciones en la asamblea del 2025 sobre cambios de fachada por la alegación de no cumplir con el requisito de uniformidad que exige la Escritura Matriz y el Reglamento del Condominio.

[...]

Según expusimos anteriormente, en el presente caso no existe controversia entre las partes: en cuanto a que las opciones de diseño propuestas constituían un cambio

de la fachada y estaban sujetas al requisito de unanimidad para su aprobación. A su vez, en cuanto a la propuesta de remoción de rejas posteriores en los apartamentos ubicados en los primeros niveles y la propuesta para permitir que las puertas y ventanas ya instaladas permanecieran hasta que fueran reemplazadas tampoco existe controversia entre las partes en que las mismas también constituyen una alteración de la estética o el diseño arquitectónico del Condominio. Por ello precisamente fueron sujetas a una votación unánime del Consejo. En particular, en cuanto a los cambios que ya habían sido realizados, se incluyeron los mismos en la Agenda de la Convocatoria para la Asamblea del 2025, sujeto a una votación unánime, y con ello subsanar la acción.

La escritura matriz de un condominio y su reglamento no son una sola fuente de obligaciones para los participantes del régimen. *Soto Vázquez v. Vázquez Torres,* 138 D.P.R. 282 (1995).

En el caso de *Batista de Nobbe v. Junta de Directores del Condominio Terrace,* 185 D.P.R. 206 (2012), el Tribunal Supremo expresó, haciendo referencia a sentencias previas, que "la escritura matriz es un estatuto privado --al cual se adhieren los titulares cuando compran sus respectivos apartamentos-- que gobierna a los condóminos o titulares, y a cuyas disposiciones debemos acudir para dirimir cualquier conflicto, a menos que tales disposiciones violen la ley, la moral o el orden público." Previo a ello señaló así:

[l]a escritura matriz constituye "la fuente vinculante para los condóminos, **luego de la Ley**". M. J. Gadreau, *El condominio: El régimen de propiedad horizontal en Puerto Rico.* 1ra ed. Rio Piedras, Puerto. Rico, Editorial Dictum, 1992, pág. 71. **(énfasis nuestro)**

Si bien es cierto que en la Escritura Matriz del Condominio se dispone sobre la importancia de la conservación de la fachada, a los efectos de que haya uniformidad, la Ley de Condominios, *supra*, establece cuál es el proceso a cumplirse para que: 1) un titular pueda cambiar la forma externa de la fachada o cambiar puertas o ventanas con diseños distintos a las del conjunto, o 2) para que en la eventualidad de que, mediante la opinión de un perito, quede establecido que los elementos originales no puedan ser reparados o sustituidos por unos nuevos de igual diseño, sé pueda decidir el tipo y diseño que sustituirá al original, Nos referimos al antes transcrito Artículo 39(b)(5).

Por lo que las propuestas sobre las alternativas de puertas y ventanas y las propuestas que permitan solo a algunos de los titulares realizar algún cambio, como la propuesta para que algunos titulares puedan remover las rejas posteriores en sus apartamentos ubicados en los primeros niveles, sí pueden estar sujetas a una aprobación válida. En el presente caso, tales propuestas requerían una votación unánime de los titulares, toda vez que el Condominio Costa Dorada

II fue-sometido al régimen de propiedad horizontal previo a la vigente Ley de Condominios, supra. Como expresamos anteriormente, se cumplió dicho requisito. A su vez, según determinamos previamente, en cuanto a que permanezcan los cambios ya realizados hasta que se reemplacen, la validación unánime subsanó la acción.

Concluimos que las votaciones de cambio de fachada y de aprobación retroactiva de los cambios ya realizados fueron sujetas a una votación unánime del Consejo, y el proceso seguido durante la asamblea del 2025 dio cumplimiento estricto a las disposiciones de la Ley de Condominios, supra. Determinamos que se configuró una aprobación válida de los asuntos objeto: de la querella de epígrafe. Por todo lo cual, se declara sin lugar la impugnación por alegada nulidad presentada por la parte querellante. Procede declarar con lugar la solicitud, de desestimación presentada por la parte querellada.

En desacuerdo con este dictamen, el 20 de enero de 2026, los recurrentes presentaron una solicitud de reconsideración.[12] Atendida la solicitud, el 22 de enero de 2026, el DACo emitió y notificó una *Resolución en Reconsideración* declarándola No Ha Lugar.[13] Aún inconforme, el 23 de febrero de 2026, los recurrentes presentaron el recurso de epígrafe y formularon los siguientes señalamientos de error:

**ERRÓ EL DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR AL CONCLUIR QUE LA DETERMINACIÓN DEL CONSEJO, A LOS EFECTOS QUE LA OPOSICIÓN DE LA RECURRENTE FUE CAPRICHOSA, FUE VÁLIDA BASÁNDOSE ÚNICAMENTE EN EL CUMPLIMIENTO PROCESAL DEL ARTÍCULO 52 DE LA LEY DE CONDOMINIOS, SIN EVALUAR EL FUNDAMENTO SUSTANTIVO DE LA OPOSICIÓN DE LA RECURRENTE, PERMITIENDO ASÍ QUE EL CONSEJO DE TITULARES ACTÚE COMO "JUEZ Y PARTE" PARA DESCARTAR ARBITRARIAMENTE UNA DISCREPANCIA LEGÍTIMA Y EVADIR EL REQUISITO DE UNANIMIDAD.**

**ERRÓ EL DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR AL NO CONCLUIR QUE LA OPOSICIÓN DE LA PARTE RECURRENTE A LOS CAMBIOS DE FACHADA PROPUESTOS EN LA ASAMBLEA DEL 23 DE FEBRERO DE 2025 FUE APROPIADA Y VÁLIDA, IGNORANDO QUE DICHA OPOSICIÓN SE FUNDAMENTÓ EN EL EJERCICIO LEGÍTIMO DE UN DERECHO PROPIETARIO DESTINADO A PROTEGER LA ARMONÍA ESTÉTICA**

---

[12] *Véase*, Entrada Núm. 18 del apéndice del recurso, SUMAC TA.
[13] *Véase*, Entrada Núm. 19 del apéndice del recurso, SUMAC TA.

**Y EL VALOR DE TASACIÓN DE SU PROPIEDAD FRENTE A DISEÑOS DISPARES EN ABIERTA CONTRAVENCIÓN A LA JURISPRUDENCIA DEL TRIBUNAL SUPREMO DE PUERTO RICO QUE RECONOCE ESTOS CRITERIOS COMO PILARES FUNDAMENTALES Y LEGÍTIMOS EN EL RÉGIMEN DE PROPIEDAD HORIZONTAL, ASÍ COMO PRESERVAR LA UNIFORMIDAD ARQUITECTÓNICA EXIGIDA POR LA PROPIA ESCRITURA MATRIZ y REGLAMENTO DEL CONDOMINIO**

**ERRÓ EL DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR AL CONCLUIR QUE SE CONFIGURÓ UNA APROBACIÓN VÁLIDA DE LAS PROPUESTAS DE CAMBIO DE FACHADA (PUERTAS, VENTANAS Y REMOCIÓN DE REJAS) Y LA APROBACIÓN EX POST FACTO DE LOS CAMBIOS DE FACHADA NO APROBADOS EXISTENTES, A PESAR DE QUE TALES MEDIDAS SON CONTRARIAS AL REQUISITO DE UNIFORMIDAD ESTABLECIDO EN EL ARTÍCULO XV DE LA ESCRITURA MATRIZ, EL CUAL CONSTITUYE LA FUENTE VINCULANTE DE OBLIGACIONES PARA TODOS LOS TITULARES DEL RÉGIMEN.**

Atendido el recurso, el 24 de febrero de 2026, emitimos una *Resolución* concediéndole a la parte recurrida hasta el 16 de marzo de 2026 para presentar su posición en cuanto al recurso. Además, le ordenamos al DACo a presentar copia certificada del expediente administrativo. En cumplimiento con nuestra orden, el DACo presentó la copia certificada del expediente administrativo. Además, el 15 de marzo de 2026, el Consejo presentó su *Alegato en Oposición a Apelación* y negó que el DACo cometiera los errores que los recurrentes le imputaron. Con el beneficio de la comparecencia de ambas partes, procedemos a atender el asunto ante nos. *Veamos.*

II.

**-A-**

La doctrina de revisión judicial nos encomienda "examinar si las decisiones de las agencias administrativas fueron hechas dentro de los poderes delegados y son compatibles con la política pública que las origina". *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 35 (2018). Al efectuar tal encomienda, debemos "otorgar amplia deferencia a las decisiones de las agencias administrativas". *Vázquez v. Consejo de Titulares,* 2025 TSPR 56, 215 DPR ___ (2025).

La normativa jurisprudencial ha reiterado que existe en el derecho puertorriqueño una presunción de legalidad y corrección a favor de los procedimientos y decisiones realizadas por las agencias administrativas. *Rolón Martínez v. Supte. Policía, supra*, pág. 35. Lo anterior responde a la experiencia y pericia que se presume tienen dichos organismos para atender y resolver los asuntos que le han sido delegados. *Vázquez v. Consejo de Titulares,* supra.

Así, el estado de derecho vigente nos impone otorgarle deferencia a la agencia administrativa, siempre que la parte que la impugne no demuestre evidencia suficiente que rebata la presunción de legalidad y corrección. *Katiria's Café, Inc. v. Municipio Autónomo de San Juan*, 2025 TSPR 33, 215 DPR ___ (2025). Por lo tanto, al realizar nuestra función revisora debemos enfocarnos en determinar si la agencia administrativa: (1) erró en aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente; y (3) si lesionó derechos constitucionales fundamentales. *Torres Rivera v. Policía de PR*, 196 DPR 606, 627-628 (2016).

De este modo, si al realizar nuestra función revisora no nos encontramos ante alguna de las situaciones previamente mencionadas, tenemos el deber de validar la determinación realizada por la agencia administrativa. Íd. Ello, aun cuando exista más de una interpretación posible en cuanto a los hechos. Íd., pág. 627. Ahora bien, es preciso recordar que las conclusiones de derecho, por el contrario, serán revisables en todos sus aspectos. Sección 4.5 de la Ley Núm. 38-2017, según enmendada, mejor conocida como *Ley de Procedimiento Administrativa Uniforme del Gobierno de Puerto Rico* (LPAUG), 3 LPRA sec. 9675.

**-B-**

La Ley Núm. 104 de 25 de junio de 1958, según enmendada, mejor conocida como *Ley de Condominios*, 31 LPRA sec. 1291 *et seq.* preceptuaba todo lo relativo al régimen de propiedad horizontal. Sin

embargo, esta fue derogada por la Ley Núm. 129-2020, según enmendada, mejor conocida como *Ley de Condominios de Puerto Rico*, 31 LPRA sec. 1921 *et seq.* (Ley de Condominios), aplicable al presente caso. Dicha Ley se creó con el fin de establecer un régimen jurídico atemperado a los cambios sociológicos que ha experimentado nuestro país y para facilitar la vida en convivencia. Exposición de Motivos, Ley Núm. 129-2020, *supra.*

En lo pertinente al caso ante nos, el Art. 3(o) de la Ley de Condominios de Puerto Rico, 31 LPRA sec. 1921b, define el término fachada como el diseño del conjunto arquitectónico de los elementos comunes y la estética exterior del edificio, conforme surge de los documentos constitutivos del régimen. En armonía con lo anterior, el Art. 39 (b)(5) de la referida ley, 31 LPRA sec. 1922k, dispone expresamente el requisito de aprobación cualificada que debe cumplirse para cualquier alteración a la forma externa de la fachada o a los elementos exteriores del apartamento, estableciendo las condiciones y el alcance de dicha limitación. Particularmente, este lee como sigue:

> Ningún titular u ocupante podrá, sin el consentimiento de dos terceras partes (2/3) de los titulares, que a su vez, reúnan dos terceras partes (2/3) de las participaciones en las áreas comunes, cambiar la forma externa de la fachada, ni decorar o cambiar las paredes, puertas o ventanas exteriores con diseños, colores o tonalidades distintas a las del conjunto. Cuando una propuesta de cambio de la forma externa de la fachada, decoración de las paredes, puertas o ventanas exteriores con colores o tonalidades distintas a las del conjunto, sea sometida a votación del Consejo de Titulares será suficiente la aprobación de por lo menos dos terceras partes (2/3) de todos los titulares, que a su vez, reúnan dos terceras partes (2/3) de las participaciones en las áreas comunes. **Las disposiciones bajo este subinciso con relación al número de votos requeridos, no se aplicarán a los inmuebles sometidos al Régimen de Propiedad Horizontal, previo a la aprobación de esta Ley, los cuales sólo se podrán modificar por unanimidad de los titulares.**
>
> […]

Cuando a juicio de perito no se puedan reparar o sustituir los equipos o elementos originales del edificio que forman parte de su diseño arquitectónico, tales como ventanas, puertas, rejas u ornamentos, el Consejo de Titulares decidirá por voto mayoritario el tipo y diseño del equipo o elemento que sustituirá al original. Cualquier titular que interese sustituir tales elementos o equipos, tendrá que hacerlo conforme al tipo y diseño adoptado por el Consejo. La imposición a todos los titulares de efectuar la sustitución requerirá que se cumpla con los requisitos dispuestos en el Artículo 49 de esta Ley sobre obras de mejora. (Énfasis suplido)

Por su parte, el Art. 52 de la Ley de Condominios, 31 LPRA sec. 1992, establece un procedimiento que faculta al Consejo de Titulares a debatir y votar sobre los fundamentos de cualquier oposición planteada por los titulares respecto a los asuntos discutidos en asamblea, particularmente cuando se trate de decisiones que requieren aprobación mediante voto cualificado o unanimidad. Al respecto, se dispone lo siguiente:

Los acuerdos del Consejo de Titulares se someterán a las siguientes normas:

a) Los titulares presentes en la asamblea tendrán autoridad para determinar discutir o dar por discutidos los asuntos contenidos en la agenda de la asamblea.

b) La mayoría requerida reglamentariamente para la adopción de acuerdos se computará tomando como cien por ciento (100%) el número de titulares presentes o representados al momento de votarse por el acuerdo, excepto en aquellos casos en que se requiera unanimidad o del voto de dos terceras partes (2/3) de todos los titulares, que a su vez, reúnan dos terceras partes (2/3) de las participaciones en las áreas comunes, en cuyo caso, se requerirá dar cumplimiento con las disposiciones del inciso (c), siguiente.

c) Cuando los titulares presentes en una asamblea convocada para tomar un acuerdo que requiera unanimidad o de dos terceras partes (2/3) de todos los titulares, que a su vez, reúnan dos terceras partes (2/3) de las participaciones en las áreas comunes estos adoptasen dicho acuerdo, aquellos que, debidamente citados no hubieren asistido serán notificados de modo fehaciente y detallado del acuerdo adoptado, y, si en un plazo de treinta (30) días a partir de dicha notificación no manifestaren en la misma forma su discrepancia quedarán vinculados por el acuerdo que no será ejecutable hasta que transcurra tal plazo, salvo que antes manifestaren su conformidad.

**La oposición a un acuerdo que requiera unanimidad o dos terceras partes (2/3) de todos los titulares que a su vez reúnan dos terceras partes (2/3) de las**

**participaciones en las áreas comunes deberá fundamentarse expresamente, bien en la asamblea o por escrito, según se dispone en el párrafo anterior, y en ningún caso podrá basarse en el capricho o en la mera invocación del derecho de propiedad. La oposición infundada se tendrá por no puesta.** La declaración de un voto caprichoso será tomada por el Consejo de Titulares en la asamblea en cuestión. (Énfasis suplido)

En vista de lo anterior, el esquema normativo vigente demuestra que cualquier alteración a la fachada constituye una actuación excepcional sujeta a un estándar riguroso de aprobación y a un procedimiento formal que garantiza deliberación, notificación adecuada y oposición fundamentada. Este andamiaje responde a la naturaleza colectiva del régimen de propiedad horizontal y a la necesidad de proteger la integridad arquitectónica y el valor común del inmueble frente a actuaciones individuales.

III.

En el caso de autos, los recurrentes impugnaron la *Resolución* que emitió el DACo el 29 de diciembre de 2025 declarando No Ha Lugar la *Querella* presentada el 15 de noviembre del 2024. En particular, en su primer señalamiento de error cuestionaron la determinación del DACo al validar la actuación del Consejo de calificar la oposición de los recurrentes como caprichosa basándose únicamente en el cumplimiento procesal del Art. 52 de la Ley de Condominios, *supra*, sin evaluar el fundamento sustantivo de dicha oposición, lo que, a su entender, permitió que el Consejo actuara como "juez y parte" y eludiera el requisito de unanimidad.

Asimismo, en su segundo señalamiento de error, argumentaron que el DACo erró al no reconocer que la oposición de los recurrentes a los cambios de fachada propuestos en la asamblea del 23 de febrero de 2025 era apropiada y legítima. Sostuvieron que la oposición se fundamentó en el ejercicio de un derecho propietario destinado a proteger la armonía estética, el valor de tasación de su propiedad y la uniformidad arquitectónica exigida por la Escritura

Matriz y el Reglamento del Condominio, criterios expresamente avalados por la jurisprudencia del Tribunal Supremo de Puerto Rico.

Por último, en su tercer señalamiento de error, indicaron que el DACo también falló al concluir que se configuró una aprobación válida de los cambios de fachada (puertas, ventanas y remoción de rejas) y de los cambios *ex post facto* ya existentes, a pesar de que estas medidas contravienen el requisito de uniformidad establecido en el Artículo XV de la Escritura Matriz, fuente vinculante de obligaciones para todos los titulares del régimen.

Discutiremos los tres señalamientos de error en conjunto por estar íntimamente relacionados entre sí. En el presente caso, surge del expediente administrativo que el Consejo celebró una asamblea el 23 de febrero de 2025 en la cual la Junta de Directores sometió a consideración tres (3) alternativas de cambio de fachada relacionadas con puertas y ventanas. Según consta en el acta, el propósito de la propuesta era que las tres (3) alternativas fueran aprobadas, bajo el entendimiento de la Junta de que las mismas armonizaban con el diseño arquitectónico del condominio o, al menos, no lo afectaban. Las opciones fueron previamente circuladas junto con la convocatoria y se describían, en síntesis, como: Opción (1) puertas corredizas y ventanas tipo guillotina con marco de aluminio y cristal color bronce para apartamentos de esquina; Opción (2) puertas corredizas y ventanas proyectadas con marco de aluminio y cristal color bronce para apartamentos de esquina; y Opción (3) puertas corredizas de cuatro hojas con marco de aluminio y cristal color bronce para apartamentos interiores.

Asimismo, el acta refleja que el asesor legal del Consejo expresó que, ante la ausencia de un arquitecto o perito que evaluara si las alternativas alteraban la forma externa de la fachada o si las estructuras existentes podían ser reparadas conforme al diseño original, las propuestas serían tratadas como si requirieran

unanimidad. Se abrió entonces un proceso de amplia discusión y, concluido este, se solicitó a los titulares que se oponían a las alternativas que fundamentaran expresamente su oposición, conforme al procedimiento dispuesto en el Art. 52 de la Ley de Condominios, *supra.* Dichos fundamentos fueron sometidos al juicio del Consejo para determinar si constituían votos caprichosos.

Las opciones impugnadas por los recurrentes fueron la primera y la segunda. Específicamente, en cuanto a la Opción (1), la Sra. Lorraine Alicea Torres fundamentó su oposición en que el diseño propuesto contravenía la Escritura Matriz, la cual exige uniformidad en el condominio, y que los cambios afectarían el valor del inmueble y podrían perjudicar la venta de los apartamentos ante potenciales compradores. Cinco (5) titulares votaron que la oposición estaba debidamente fundamentada; sin embargo, el Consejo determinó que la misma era caprichosa por el voto de veintiocho (28) titulares.

En cuanto a la Opción (2), el Sr. José M. Pérez López objetó que la ventana proyectada no correspondía al diseño original aprobado por el desarrollador, que se pretendía validar una instalación realizada sin el debido proceso de aprobación —esto es, una aprobación *ex post facto*— y que no se había contado con evaluación pericial que determinara su compatibilidad con la arquitectura del condominio. En esta ocasión, cinco (5) titulares votaron que la oposición estaba bien fundamentada, pero el Consejo la declaró caprichosa por el voto de treinta (30) titulares.

Examinado el expediente administrativo en su totalidad, concluimos que el Consejo observó el procedimiento dispuesto en el Art. 52 de la Ley de Condominios, *supra,* al atender las oposiciones presentadas. El acta de la asamblea refleja que las alternativas fueron previamente notificadas a los titulares junto con los diagramas correspondientes; que se abrió un espacio amplio de

discusión; que se permitió a los titulares expresar y fundamentar individualmente sus objeciones; y que, posteriormente, tales fundamentos fueron sometidos al juicio del Consejo para determinar si constituían votos caprichosos. No surge del expediente que se haya limitado la participación de los titulares ni que se haya omitido etapa procesal alguna. Por el contrario, el trámite seguido evidencia cumplimiento sustancial con el procedimiento estatutario.

Superado el aspecto procesal, corresponde evaluar si el DACo erró al concluir que la determinación del Consejo —al calificar como caprichosas las oposiciones a las Opciones 1 y 2— no fue arbitraria ni irrazonable. Del análisis de las alternativas propuestas no se desprende que estas alteren la configuración esencial de la fachada ni que introduzcan un elemento disonante que rompa la armonía arquitectónica del condominio. Las opciones contemplaban variaciones dentro de un mismo marco estructural, es decir, puertas corredizas y tipos de ventanas en aluminio con medidas similares y cristal color bronce, manteniendo uniformidad en materiales, tonalidad y proporciones. No se trató de la introducción de colores distintos, materiales incompatibles o diseños individualizados, sino de alternativas predeterminadas y aplicables de forma general a categorías específicas de apartamentos (esquina e interior).

En cuanto a la Opción (1), el uso de puertas corredizas y ventanas tipo guillotina con marco de aluminio y cristal bronce no introduce un elemento extraño al lenguaje arquitectónico del edificio. La uniformidad en el color del cristal y en las dimensiones del marco preserva una apariencia coherente y consistente. Del mismo modo, la Opción (2), aunque incorpora ventanas proyectadas, mantiene las mismas especificaciones de marco y cristal, así como proporciones análogas a las demás alternativas. La mera diferencia en el mecanismo de apertura no equivale, por sí sola, a una alteración sustancial de la fachada cuando el diseño

externo conserva uniformidad visual en materiales, color y estructura. De igual forma, cabe destacar que las alternativas aprobadas no facultan a cada titular a seleccionar diseños individualizados o dispares, sino que establecen opciones uniformes previamente definidas y aplicables de manera general. Así, el resultado final continúa siendo un conjunto armónico, sin proliferación de estilos incongruentes.

En cuanto a los otros cambios, la remoción de barandas en los balcones posteriores de los apartamentos del primer piso se sometió a consideración del Consejo con condiciones claras: los titulares que decidieran removerlas debían restaurar los pisos, eliminar columnas y reponer losas faltantes. Tras un debate sobre la necesidad de obtener la aprobación de todos los titulares del edificio, se eliminó esta condición por votación de veinte ocho (28) a favor y cuatro (4) en contra. Se permitió a los titulares oponentes fundamentar su oposición, incluida la Sra. Lorraine Alicea Torres, quien alegó que la Escritura Matriz y el Reglamento no permitían la remoción y que afectaba la privacidad; su oposición fue declarada caprichosa por veintitrés (23) votos ante cinco (5) que la consideraron bien fundamentada. La remoción de barandas se aprobó de manera unánime en la asamblea, asegurando que la uniformidad arquitectónica no se viera afectada.

Respecto a las puertas y ventanas ya instaladas en aproximadamente once (11) apartamentos, la Junta propuso permitir su permanencia temporal bajo la condición de que, al reemplazarlas, se adoptaran los modelos aprobados por el Consejo. La Sra. Lorraine Alicea Torres se opuso alegando contravención a la Escritura Matriz, pero el Consejo determinó, mediante voto mayoritario, que la oposición era caprichosa. La medida del "Grandfather Clause" fue aprobada unánimemente, garantizando que la uniformidad se mantendría en los reemplazos futuros y que

la coexistencia temporal de las instalaciones existentes no alteraría la armonía estética del conjunto.

En conclusión, luego de evaluar el expediente, los fundamentos de las oposiciones y el análisis de las alternativas, se considera que el DACo actuó correctamente al declarar No Ha Lugar la querella. El proceso del Art. 52 de la Ley de Condominios, *supra*, se cumplió cabalmente, los titulares tuvieron oportunidad de fundamentar sus objeciones, y las determinaciones del Consejo sobre los votos caprichosos fueron razonables y respaldadas en la evidencia y en la coherencia estética de las opciones. Asimismo, los cambios relativos a la remoción de barandas y la permisibilidad temporal de puertas y ventanas ya instaladas se ajustaron a las condiciones establecidas por el Consejo y no afectaron la uniformidad ni la armonía del condominio. En consecuencia, no podemos concluir que la determinación del DACo haya sido arbitraria, caprichosa o contraria a derecho. El DACo, al validar esa actuación, actuó dentro del marco de su autoridad y conforme a la evidencia sustancial que obraba en el expediente por lo que procede confirmar la *Resolución* recurrida.

IV.

Por los fundamentos antes expuestos, ***confirmamos*** el dictamen recurrido.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

El Juez Marrero Guerrero disiente con opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones